Good afternoon, ladies and gentlemen. This is a time for argument in the hearing on bank of the case of Edward v. LaMarque. I understand counsel are ready to proceed. Good afternoon, Your Honors. Deputy Attorney General David Cook on behalf of Appellant and Respondent. Appellant or Respondent is the appellant in this case. Yes, that's right. I'm sorry. I misspoke. No problem. Thank you. And may I please reserve five minutes of my time for rebuttal? Thank you. Your Honors, in this case, Petitioner has failed to satisfy his burden to establish that he received ineffective assistance of counsel at trial. The district court should have denied the petition with prejudice and dismissed the action. Now, in this case, we have a factual dispute between the parties regarding a fact found by the state court. And as a result, this raises an issue of the interplay between 2254D-2 and 2254E. In this case, as recent Supreme Court opinions show, the facts as found by the state court are entitled to a presumption of correctness. There is no need to conduct an intrinsic review of the record before the presumption of correctness applies. Consequently, it would appear that this court's decision in Taylor v. Maddox may not be good law anymore. I'm sorry. Counsel, it's not good law as a result of what? Of Miller-El? The two Miller-El decisions and language also in Rice v. Collins, which talks about 2254D-2 and 2254E applying simultaneously, but that the presumption of correctness applies without any discussion or of the need to conduct an intrinsic review of the fact-finding process of the state court before the presumption applies. My recollection of the latest Miller-El decision is that there is some confusion, but it doesn't seem to be a discerning reference by the court. It seems to be a bit of a throwaway. It wasn't critical to what the Court was discussing in Miller-El. I think it's Miller-El 3 is the last one. Well, but it's still, Your Honor, I believe it appears that there's no discussion of an intrinsic review before the presumption of correctness applies. The presumption of correctness applies. And looking at the text of 2254E, the presumption applies any time the applicant or the Petitioner is seeking Federal habeas relief, which is so in this case. It is Petitioner's burden to overcome that factual finding with clear and convincing evidence. And also, will Mousawadden affect this, the case that the Supreme Court is hearing this term? I'm not familiar with that case exactly. All right. Yes, Your Honor. I was just going to ask, is it your position that in the absence of any additional evidence offered by the Petitioner, that the district court simply cannot declare that the factual determination by the State Superior Court in this case is or was unreasonable? Well, Your Honor, looking at 2254E, there doesn't seem to be a limitation on what evidence can't, whether the evidence used to establish that, or I should say, overcome the presumption of correctness, must be, must have been before the State court. It would appear that any evidence could come in. However, going back to 2254D2. That wasn't my question. My question is, on the assumption, I believe was the case here, that there was no additional evidence deduced before the Federal district court, can the Petitioner overcome the presumption in the absence of offering any evidence that would permit a Federal district court to conclude that the presumption had been rebutted? In this case, Your Honor, no, he cannot. The evidence that he has pointed out that was used to, by the lower courts to overcome the presumption of correctness, was well before the, was well before both the first and second trial courts, and it was also before the State court of appeal as well. And so because he hasn't offered any new evidence, and the evidence that he has relied upon was relied upon or was certainly within the knowledge of the fact-finders of the State court, the presumption of correctness has not been overcome in this case. Isn't there a difference between the presumption of correctness and whether or not the factual determination was unreasonable? Yes, Your Honor. And that goes back to the State court of appeal. And that's what happened here. Well, Your Honor, there is the language in the Supreme Court cases which talk about the two provisions being separate and independent provisions. However, for the same reasons that Petitioner has been unable to overcome the presumption of correctness, we also submit that the factual determination by the State courts was not unreasonable in this case. And that's why Federal agencies really should have been denied on this claim. So the district court here determined that the factual determination by the State court was unreasonable. Right? So tell me why that's wrong. Well, again, where did the district court err in making that determination? Because the Fed – well, let's take it in two steps. First of all, there's the factual determination of whether it requires a tactical decision or, in his words, a mistake in asking the question that resulted in the waiver of the marital communications privilege. The State court heard all of the relevant evidence, heard the pre-trial – I'm going back to the first trial court – heard the pre-trial argument regarding the scope of the privilege, and Myers was participating in that hearing as well. And then during cross-examination of Petitioner's wife, when the hand-washing incident was asked about, there was another objection by the prosecution, more discussion in – with the court regarding the scope of the privilege, which Attorney Myers was present for. So we have two separate incidents where Attorney Myers was being advised by the very court who would make the evidentiary determination about what the scope of the privilege would be in that case. Later, during direct examination of Petitioner, he asked the question about the July 18th phone call. And once that question was asked, we no longer have a mistake by trial counsel. We have trial counsel having been told, once pre-trial, once mid-trial, about the scope of the marital communications privilege. But, Counselor, if he didn't understand that, why couldn't that still be a mistake? Your Honor's question goes more to the reasonableness of his tactical decision rather than when he – rather than whether he made a tactical decision in the first place. If you don't understand the tactic, how can it be a tactical decision? Your Honor, I believe that the tactical decision is the asking of the question to get this particular piece of defense evidence before the jury. That was a matter of tactics. Whether he was misguided, uninformed, or what have you regarding the scope of the marital privilege at that moment, that's a matter of whether his tactical decision was reasonable, a mixed question. Scalia. I usually slept during evidence class. You know, it's pretty hard to imagine somebody who took evidence in law school. I never slept through evidence class, Your Honor. Well, you know, let's – we don't know. It's pretty hard to comprehend a graduate of the law school thinking that you would not waive the privilege by getting in your version of a conversation and still be able to exclude the other part of it. But, Your Honor, I think there's – we have to focus on, again, what the tactical decision was. You keep saying – every time you say decision, you say tactical. Yes. Couldn't it have been stupid? Well, again, Your Honor, I think it wasn't stupid for him to try to get this particular piece of defense evidence before the jury. That's – that's not the rub, is it? Well, that certainly is. The rub is whether his thought that he could get half of it in and avoid the other half without waiving the privilege was tactical or an imbecilic mistake. Well, Your Honor, again, if he – if waiving the marital communications privilege truly was his tactic, he'd have the opportunity to do so prior to trial when the matter first came up. And he'd have the opportunity to do so during cross-examination of the wife, but yet he didn't do so. Here's a different situation. At this point, he's faced with a mountain of prosecution evidence, and he's trying to do whatever he can to get in favorable defense evidence. And I think one of the trial judges even characterized it as he's dancing close to the line. He may not have understood what was going to happen, but he's trying to get in as much defense evidence as possible. Excuse me. You know, it would help me if you just played out how do you think, you know, this tactical decision you say, if things had worked out as you think he hoped it would work out, what would it have looked like? What would the examination have looked like? Well, I believe, Your Honor, it's He was obviously not hoping to get in the part of the testimony that the other part of the conversation, right? So how did he expect things to play out in a way that would be favorable to his client? Well, I disagree with one aspect of your question, Your Honor. You disagree with the question? Well, I believe that his objective was to get this defense evidence in. Now, whether he knew for a fact or not that the admission by or that the testimony of his wife would come in. I withdraw that part of the question. How would it have played out? What was the way he thought he thought things would work out? Well, I explained this in quite a bit of detail from in pages 39 to 56 of the appellant's opening brief. However, let me go through it again. At this point, the prosecution had submitted, like I said, an overwhelming amount of evidence pointing to Petitioner as the murderer. And at this point, Counsel Attorney Myers is at his doing his best to try to get in whatever favorable defense evidence there could be. It's sort of like a pitcher winding up. Why don't you let go of the ball? I know what he what his situation was. What how did he expect it to play out? How did he expect, you know, he asked a question, there's an answer, there's an objection. You know, just play it out for me, little videos. Well, then tossing that ball out there, once the July 18th, once Petitioner's testimony of the July 18th conversation comes out, he now has direct evidence rather than circumstantial evidence from which to explain why his wife, on a moment's notice, left to go to Florida all the way across country when she did not want to. I don't think that's what Judge Kaczynski is asking, unless I'm missing the point. Did this guy really expect the trial judge to say, you know, I read Wigmore last night, and I'm going to let in the evidence about washing off the dog poop, but I'm not going to let her testify about what he said about the murder? Did he really expect that? Was that his tactic? Again, I as I've said before, I think his tactic was to get in as much defense evidence as possible. Would you hire as a first-year law student intern someone who had that understanding of the rules of evidence and marital privilege? Well, he had been advised, again, he had been advised prior to trial and mid-trial regarding the scope of the privilege. And at this point, yes, Your Honor. I have a slightly different way to maybe ask some of the same questions, but let's suppose for a minute that he just blundered into what he did and that it wasn't tactical. Is that the end of the conversation? Does that mean you lose? Or if he blundered into something that someone who thought harder about it might have done anyway, who had made a reasonable decision, what are we supposed to do with that? And as you answer that, explain to me if any reasonable tactically thinking lawyer would have gone down the road he did and why they might have done so. If this Court finds that the finding of fact or the presumption of correctness has been overcome, we go back up to 2254d-2, and again, we look at prong one of Strickland, and we look to see whether counsel's conduct in this case falls within the scope of objectively reasonable conduct. And here's where an attorney, here's where a reasonable attorney could have done the same thing. Again, faced with the heavy amount of prosecution evidence, which has been found in the reports below, a lot of prosecution evidence, he's trying to get in what he believes to be favorable defense evidence, which will explain the question. Pardon me, Your Honor? That would overcome a confession that's coming in right on the tail of that evidence? Let's take the confession in its context. We don't have a situation where the prosecution has no evidence whatsoever but the confession. If that were the case, I would agree, Your Honor, that then the admission was very damaging, overwhelmingly so. Counsel, is there any evidence other than the confession that was other than circumstantial? Circumstantial in what respect? As to the defense? Yes. All the evidence against the defense was circumstantial except for the confession as I look at it. Well, this goes back to Your Honor's – well, this also answers Your Honor's question as well. We have evidence showing that the petitioner – that the petitioner had a motive to kill based on getting his partner out of the way and stop complaining. We have weapons evidence that links him to the crime. We have the victim's body found in – right by the business of Petitioner. And we have evidence that Petitioner threatened to kill this very victim. As well, after the murder occurred, when the – when the victim's cousin confronted Petitioner, Petitioner made another threat to, quote, unquote, fuck him up, too. And so, again, if the admission by the wife – or the evidence by the wife of the admission were the only evidence of a confession – well, if that were the only evidence with nothing else, I would agree, taken in context, that's pretty powerful. That's overwhelmingly so powerful. But we have here a different story. We have a lot of evidence, a mountain of evidence, all pointing to Petitioner as the shooter. Now, we have the second trial court judge saying that if I'm wrong in letting this evidence in, I don't think there would have been – there would be a serious doubt as to whether there would have been a conviction. Well, Your Honor, it's true that the second trial judge made those observations, but they're purely superfluous. Cuts – cuts against your mountain of evidence, does it not? Well, I don't believe so. And – and, again, the second trial judge, well, maybe the trial judge – that – maybe that trial judge didn't focus on the entire breadth of the prosecution case at that time. Can I ask a question? We should accept the trial court's factual determination about tactical decision, the first sitting trial judge, but the second sitting trial judge is just speculating. Is that it? Not weighing all the evidence, not looking at the entire record, so we don't give deference to that factual finding? It is true we don't know what prompted the judge to – to make those remarks. Do we know what prompted the judge to make the remarks in the case of the first trial judge? That was her reaction based on what she observed at the time. So is that what you're saying is a pure factual determination equivalent to what Justice Kennedy was talking about in the Rice decision, where the trial judge was observing the demeanor of the prosecutor? Is that how you're putting them on equal terms? Yes, Your Honor. The first trial judge had the opportunity to witness Attorney Myers through the trial, and not only – and during the first hearing regarding the scope of the marital privilege, as well as the – during the cross-examination of the wife. And that credibility determination is based on observations. We have to pursue the – What is the credibility? Whose credibility is at stake now? Attorney Myers' credibility is at stake. He calls – Well, at the second trial counsel, what we're talking about is he decided that the marital privilege had been waived. And so he let in all of his testimony. Myers was not a factor in the second trial at all. What was said was, gee, if I'm wrong in finding that the marital privilege was waived, I think that that evidence is so critical that the result might have been different. Now, we disregard that factual finding, is what Judge Fischer is asking? Yes, Your Honor. I think that factual finding – or it's not even a finding. It's not a judgment of any kind. Once prong one has been found to be satisfied, prong two, whatever his statements are, they're irrelevant at that point. And furthermore, the State court of appeal made an actual – or ruled on the merits on the claim, and so I submit that the look-through doctrine doesn't even apply as to the prejudice prong. Well, the Court never made a prejudice finding. He found that it was a tactical decision. So the court of appeals never said anything about prejudice as far as I read the record. But the court of appeal did deny the claim on the merits in a reasoned opinion. That's right. Not silently. But he didn't deal with this particular issue as to which there was a factual finding by the trial court, which was the last finding. Your Honors, well, even if no prejudice determination was made by the court of appeal, I submit going back to Your Honor's question about the credibility, the first trial judge was in the unique position to see what Myers was doing, and the credibility call comes into play, because after the privilege has been found to be waived, Attorney Myers immediately falls on his sword, conveniently so. And it's at that point that the trial judge says, well, you know, I don't think so. I don't – you say it's a mistake. I don't think so. That's also part of the factual finding regarding the tactical decision. So the court of appeal – could I just get a clarification on the court of appeal distills this down, much as you've been arguing, that the defense counsel was aware that the trial court had ruled that defense counsel could not introduce evidence of the defense's version of a conversation between appellant and Gaines without opening the door. That was his state of mind, according to the court of appeal. And, therefore – Excuse me. We had some competition from the Air Force. Actually, it's the Navy. Those are the Blue Angels. They arranged a flyover because they knew that a member of the California government was going to be here today. I'm honored, Your Honor. Well, I thought they were trying to have my question, so I don't know. It's an equal opportunity. In any event, the court of appeal is assuming, as I understand it, that Myers was fully aware that if he asked a question that elicited part of the conversation with his client, he was opening the door to the confession testimony of his former wife. And they conclude that that was a reasonable tactical decision because he was doing, and he was opening the door, and he did it deliberately, coming back to the question that had been raised by others. What could he possibly hope to gain by that? What's the tactical advantage? As I understand what you're saying, there was evidence of his guilt, which was circumstantial, and there was evidence that he was trying to get in, which he'd only been able to put in circumstantially or by his own testimony, that there was a reason for his wife to leave. So it sounds like you're saying he made a tactical decision to accumulate the evidence on his excuse for his wife leaving, knowing that she was going to accumulate the evidence of his guilt by his actual statement to her that he had actually killed the victim. So in that, where do we get into a judgment as to the competency and the reasonableness of what the trial counsel's tactic is? Well, again, I think I don't – I don't – I would submit that the thought process may not have been as complex, and it may have been more immediate in the heat of the moment at trial. But even if we find – or even if this Court finds that Attorney Myers made a mistake rather than acted as a matter of tactics, Attorney Myers' conduct in the abstract still must be – still must be judged for reasonableness under pronged – Correctively unreasonable. Exactly. As well as whether the court of appeals' denial of that claim also was a reasonable application of Strickland in the case. Let me try my question one more time, because I don't have a given answer. I'm just – I'm trying to focus a little better. When he asked the question, did he understand and expect that the confession would come in and said, well, it's just one of those things that you have to take in order to get in an important piece of evidence? Or did he understand and expect that the confession would not come in? Frankly, Your Honor, I don't know the answer to that question. I don't believe Myers ever directly – I don't believe Myers ever testified or provided any argument that would directly answer your question. Did Edwards ever ask for an evidentiary hearing? The court of appeals' decision in Witherspoon involved two separate conversations. I'm sorry. I missed the first part of your question, Your Honors. Didn't he argue that his understanding was that the privilege was found to have been waived in Witherspoon, which involved one conversation, whereas here there were two separate conversations, therefore the privilege is waived as a bunch of other entirely separate conversation on a different night? That is correct, Your Honor. However, those statements – as I'm taking Judge Kaczynski's question, I'm not sure whether he's focusing specifically at the time the question was asked. Judge Reimer's comments show – are regarding the argument that was made after the finding or after the question was asked and the matter of the waiver came up again. Again, I don't – I'm trying to answer your question. I'm taking the position that under either scenario it was a reasonable tactical decision, that either he said, I know this other stuff will come in, it's a hit I have to take, that's a reasonable tactical decision, and that I am going to get the evidence in and I have no idea, I hope that the other stuff doesn't come in, and that's a reasonable tactical decision as well. That's your position. Either one of those would be a reasonable tactical decision. Either looking at it just – even if he put on blinders as to the waiver, as to the privilege, and wanted just this evidence alone, then yes, I'd say that's a reasonable tactical decision. Even if he didn't have blinders on regarding the privilege, then yes. Why do you say that? Because, again, he's trying to get in as much positive defense evidence as possible in the face of it. Anything like that has to be weighed against the costs. You know, any decision to get in evidence that is not made with weighing the costs of taking that move, it strikes me as being not tactically, not well thought out. Your Honor, I see that I'm now into my time. Counsel, I don't have an answer yet to my question. Did Edwards ever ask for an evidentiary hearing so that he could get testimony under oath about whether Myers was such an ignoramus or whether Myers figured it was worth taking the risk that Witherspoon would be extended rather than limited or what was the basis? I don't believe he requested an evidentiary hearing. However, after the first trial, before the second trial, and after the second trial, he was given an opportunity to argue these matters. I know he fell on his sword in argument, but I'm looking for under oath subject to cross. Well, the party stipulated to the content of Myers' declaration. So he was given the opportunity, but I don't believe that record was as developed by the second trial attorney. If I may, Your Honors, I'd like to reserve the rest of my time for rebuttal. Thank you. Roberts. Good afternoon, Your Honors. Stephen Lubliner on behalf of Appellee Christopher Edwards. I want to focus on the Attorney General's developing argument, which I thought today was going to focus on, Jackson v. Virginia, and how that applies to 2254d2 review. It is an argument that was simply born in 2005 in the merits brief of Rice v. Collins in the U.S. Supreme Court. It was not raised here in the argument. Counsel, is our panel entitled to read the transcripts itself and decide what's reasonable, or are we required to accept what the State court did, even if we think it's wrong, unless it's totally unreasonable? I'm not – I'm sorry. I'm not following the question. Are you allowed to read the transcripts? No. Can we make our own independent judgment on the transcripts about whether the lawyer acted stupidly or tactically, albeit the tactic didn't result in an acquittal, or do we have to defer to the State court's determination that the defense lawyer acted tactically unless it goes beyond wrong on the record to unreasonable? Well, I think the answer is yes, that you can independently review the transcripts. The transcripts, the State court transcripts, establish how Mr. Myers conducted himself in relation to the marital privilege issue and the waiver. The transcripts establish the state of the record. As far as whether or not trial counsel acted in a constitutionally reasonable manner, that would be a mixed question of law and fact where you would look at the circuit. What about 2254d2, that the decision has to be an unreasonable determination of the facts in light of the evidence presented in the State court proceeding? I read that to mean we don't start by reading the transcript and deciding whether we think the lawyer was acting stupidly or tactically. We start by reading the State court decision and then decide if that's unreasonable in light of the facts presented in the State court proceeding. If I understand you right, you're saying, no, you don't do that. You start by reading the transcript and deciding upon the Federal court's judgment about whether it was stupid or tactical. Well, you start by reading the decision and then you go back to see what underlies it as far as determining whether it's supported in a factual manner and whether it's constitutionally reasonable, which is really a legal overlay. And as Mr. Cook admits, more of a 2254d1 issue than a d2 issue. Am I correct that this isn't the lawyer getting in part of a conversation and trying to keep out the other part? It's getting in a conversation that takes place on one day and trying to keep out a conversation that takes place on a different day? Well, that is what Mr. Cook persists in arguing, but I thought one was the tied conversation and one is the phone call conversation. Well, the prosecutor, who, for reasons that are unclear to me, seemed to be Mr. Meyer's best friend for a while during the trial, finally, that's all I can stand, I can't stand no more, when he went into the evidence about the phone call. I frankly agree with your sarcasm. I had the same thought, but it distracts me from the issue. Are they two days or one day? Well, they're two days. There's really only, if we're going to focus on the phone call, which I submit is the improper focus, it's still the same race, geste, for want of a better word, about what happens surrounding the murder. Is Witherspoon one day or two days? I don't know what it means. Maybe I don't either. Just the circumstances surrounding what's at issue in the litigation, which is who killed Mr. Thomas. It was a different day, but if you look at what the first trial court found, the first trial court mentioned the conversation about the dogs, the conversation about the phone call, and also mentioned the conversation about going to the brother's house. The court of appeal, which, if that is the dispositive State court decision that we're looking at, focused only on the conversation about the dogs, which occurred on the night of the murder. Counsel, one of the points that the dissent in the panel made was that the problem lay not so much with the questions that Miles asked, but with the follow-on answers, unrequested answers, that the witness gave. And what is your response to that? Were the questions themselves... Were the questions themselves patriotic? Were they designed to specifically elicit conversation, or did they fall short of that, and did the problem arise from nonresponsive or extra answers? What is your position with respect to that? My position is that the Mr. Cook agrees, I think, that trial counsel asked questions trying to elicit favorable defense evidence. I told my wife I was just cleaning up after the dogs. That doesn't quite answer my question. What specifically were the questions that Myers asked, the questions that he asked, not the answers that were given? What were the questions that he asked that, in your view, were beyond the pale, that were unreasonable under whatever standard we choose to apply? Well, as far as the cleaning up after the dogs, he says, I believe the question he asked is, did you tell her about the dogs? Mr. Edwards had testified that he was... His wife. Okay. And that calls for what, a yes or no answer? Well, it calls for a yes or no answer, or a more elaborate answer. But you're saying that does call for some conversation, and that's enough? Yes, it is enough. He acknowledged that he told her that he was cleaning up after the dogs, which is a conversation that the prosecution, of course, says never happened. And I would like to focus on the footnote in the panel opinion, which points out that trial counsel, before Mr. Myers ever got on the stand to tell his story in the only way that he knew how to tell it, to quote some of the trial courts, trial counsel asked Ms. Gaines during cross-examination about the whole scenario when she came home, and what did he tell you? He was washing his hands. What did he tell you? And the prosecutor objects. And as the footnote notes, if the prosecutor had and had an objected charitably and they had this discussion, well, that's an interesting issue. And he withdrew the question. Ms. Gaines would have said, he told me he killed Mr. Thomas. But it was withdrawn, right? Well, that was withdrawn, but I think that severely undermines Mr. and Mr. Myers had read the police reports. He knew how Ms. Gaines was going to testify. But the fact that he went into that on cross-examination severely undermines this notion of him putting on a risk-taking, strategic, line-walking tactical defense during Mr. Edwards' testimony, correct? I didn't know he knew. He knew what she said in the police report, but he or he might have had a conversation with her in preparation for trial. His client may have told him that the client had a conversation with her in preparation for trial. Witnesses go south on the prosecution sometimes. Big nasty surprise for the prosecution. It happens sometimes. You don't always know what they'll say. Well, if you don't, I think if he thought that Ms. Gaines was going to go south on the prosecution, he wouldn't have withdrawn the question. How would you know that without Edwards having asked for an expedientiary hearing to find out whether there had been some contact with her and which way she was going to go on the question? Well, he filed a motion for new trial after the first trial. That's not an evidentiary hearing. It looks to me like he was asking for an evidentiary hearing to help answer these things. In the district court or in the State court? Either one. Well, in the State court, I think Mr. Myers gave us everything that he had. I assume that Mr. Gutierrez would have asked for more. Mr. Myers said, I made a mistake. I made a mistake. And I think Mr. Cook is right. Mr. Myers was doing his job, trying to elicit favorable defense evidence, and he didn't really know what he was doing. Counsel. This is really a blundering, stupid, uninformed, unimaginably uninformed method of interrogation. And then virtually the minute the trial court informs him that he's probably waived, he raises the flag of ineffective assistance of counsel. He goes from stumbled-on to effective advocate, almost like a light switch. What do we make of that? Well, I think a lot of lawyers fall on their swords. And it's ‑‑ Strickland teaches that a single error in the course of a trial can rise to ineffective assistance of counsel. I don't need to show that Mr. Myers never should have been given a law degree in the first place or that he should be disbarred. I don't need to show that he did every last thing in that trial wrong. But why couldn't we interpret that as the superior court judge did as a very cagey, clever defense lawyer who has thrown an error argument into the record? Because either way, it benefits his client. If the judge has ruled that he's waived the privilege, the best thing to do is fall on your sword and claim that you didn't intend to do that and you made a mistake. Now you've got an appellate issue in the record. And why shouldn't we credit the trial judge who's watching him perform during the trial who immediately says, no, counsel, that was tactical. That was not a mistake. Isn't that a classic factual determination to which we must defer? To get back to Judge Kleinfeld's question. Well ‑‑ We're EDPA. Don't we have to? It's ‑‑ we really have a false dichotomy, this whole I made a mistake versus  No, no, no. It's a factual determination that it was a tactical move, not a mistake. Well, the trial court did not make a finding. You're just trying to ‑‑ you just tried to waive the privilege to create an issue of ineffective assistance after your client gets convicted. That's what the second trial judge said. No, the trial judge said he was walking ‑‑ he was probably walking a fine line. The trial ‑‑ both trial judges ultimately conceded that he made a mistake in that he did not understand the scope and breadth of the privilege and the principles of relevance that were at issue. Because he was trying to engage in a tactic of eliciting the most favorable evidence that he could without opening the door, waiving the privilege, and suffering the inculpatory evidence that would come with it. Well, competent counsel, and this comes up in the Dorsey case, the California Supreme Court of Appeal case that deals with IAC in the context of the marital privilege, which the panel also cited, that the way you do that is you have a motion that you have a ‑‑ and you get preliminary rulings about what or ‑‑ what and what does not waive the privilege to allow a hospital witness to testify that your client admitted committing a murder. Counsel, let me ‑‑ let me ask you this. You were talking before about counsel trying to elicit evidence favorable to the defendant. This evidence, at least insofar as it had the dog washing, cleaning up story, was favorable to him, or an inference could be drawn that was favorable to him, that he wasn't washing the victim's blood. What other evidence was there that was favorable to him in the record? In relation ‑‑ in the whole record? Yeah. I mean, I ‑‑ you agree that there was a strong prosecution case here. There was a ‑‑ there was a ‑‑ certainly a circumstantial case, yes. Mr. Edwards got on the stand, denied his guilt. He testified about why the guns were missing from his household, that he had given them to Mr. Thomas as security against the money that he owed him. He explained rather persuasively, I thought, why he took off about, you know, you don't know these people. They'll come and get you. They killed the wrong person. Fine. Tomorrow they'll kill the right one. The murder itself took place at the barbershop. Yes, he worked there, but there was also evidence that it was an area that a lot of petty crime went on at, and also rather persuasively that after he left, he didn't go to Tijuana. He didn't leave the country. He went to Florida, and I believe wound up in Michigan, where he lived under his own name, applied his own trade as a barber under his own name until he was arrested. And there was a confession? There was a confession? Excuse me? There was a confession? By whom? Was there a confession by him? Well, according to his wife, there was that he admitted having committed the murder when she came home that night. Well, he implicitly confessed in the conversation with a cousin that he also was going to meet the same fate. Isn't that a roundabout way of confessing as well? Well, that was the cousin's testimony. That was, I believe, Mr. Edwards denied saying that. Tell me, why couldn't the lawyer have reasonably believed that he could talk about the dog pool conversation and limit the waiver to that? I mean, after all, if somebody communicates, discloses a conversation covered by, let's say, the spousal privilege, not everything you've ever said in your marriage is then opened up. You know, things that were said five years ago between the spouses on totally unrelated subjects are not opened up. Why couldn't he reasonably believe that he could ask about the dog pool, get an answer to that, and that the conversation in a different day on a different subject, arguably, would stay privileged? Well, the conversation about the dog poop is what did him in. That's what the first trial court and the court of appeal found allowed the prosecutor to come back with under marital privilege law, under the Worthington case, under basic principles of marriage. I'm sorry. I have it backwards. It was a conversation about why he fled, right, that he wanted to get in. Right. Right. I'm sorry. I just have it backwards. So why couldn't he believe, okay, look, I can get in the conversation on this one subject, and it's another conversation on a different day that I think I have a good reasonable chance won't come in. Why couldn't he make that tactical decision? Well, first of all, I think it was wholly unreasonable. Well, yes, but, first of all, it doesn't matter because the first trial court and the court of appeal found that the privilege was waived when he asked about cleaning up after the dogs, and that's what allowed her to get in. He didn't know that ahead of time. I thought the whole idea was that he talked, he asked questions about the one conversation, and that opened the door to have the other conversation come in, have the privilege waived. Right? He asked questions about the cleaning up after the dogs, and he asked questions about what was said the night after about the phone conversation. The prosecutor objected after he started going to the phone conversation, and she talked about all three things that had been done to waive the privilege,  the court of appeal affirmed, finding, focusing only on the conversation on the night of the, about the night of the murder, about cleaning up after the dogs. Counsel, picking up on Judge Kaczynski's question, why he couldn't reasonably believe that a conversation on one night would not waive a privilege as the conversation on another night, it wasn't just Myers who had that impression in the courtroom, was it? Wasn't, didn't the prosecutor also say if he wants to ask her and start finding out everything he told her that night, he is welcome to? In other words, she was saying asking about that night may waive the privilege as to that night. He may have sold his peculiar version of Witherspoon, including to the prosecutor that night. Doesn't that show a reason to take a tactical chance? She said that after he withdrew the first question, though. And she was giving him guidance. You're waiving your privilege tonight on July 17th. So the conversation is July 17th. He thinks, well, I can ask a question on the conversation of July 18th, and it won't bite me on July 17th. As well? That's not totally irrational, is it? Well, I don't think competent counsel is supposed to take his guidance on what he can or can't do from the opposition. Well, if he's hoodwinked the prosecutor, he's halfway there, isn't he? If he's hoodwinked the prosecutor, he's halfway there. Well, I don't read her as as I don't read that comment as saying that night, to the exclusion of all other nights. If he wants to ask her and start finding out everything he told her that night, he is welcome to. It seems to me that if she's saying, if you ask about a conversation on the 17th, that means anything is said on the 17th. We're not going to talk about the 18th. Well, the 18th wasn't at issue at that point, one way or the other. That's true. But nonetheless, we're still, and if you look at the evidence code section and the cases I cite in the opening brief on the general principle that underlies this waiver issue that we're talking about, about how you don't you're not allowed to get into just the favorable aspects of a conversation or a writing and preclude the unfavorable ones from coming in. The courts construe that fairly broadly in terms of what the subject is. And the one subject that we have here is the circumstances surrounding Mr. Thomas' murder. Wasn't he taking a chance that he could sell his version of the evidence code in face of all the bad evidence that it wasn't the case? Wasn't that a tactical move? Was he trying to sell his version of the evidence code? Well, he had he had an empty bag if he was trying to sell it. He hadn't read the leading case. He didn't cite any treatises or any authorities. The prosecution had a mountain of evidence. He did argue from Worthington that there's a distinction. There are two separate days, two separate conversations. It may not be a good argument, but it was an argument. It suggests that he had given at least some thought. Well, it was an argument, and he gave it was an argument that he made after the prosecution excuse me, after the trial court handed him that case so that he could move after the prosecutor came in with all her authorities. It was not an argument that he made in a motion in limine or in response to an objection or anything like it. He had been in trouble before. He withdrew his question. I mean, he was up to the brink, and he got warned by his best friend, the prosecutor, and by the judge. You take that step, you're over the line. So he pulls back. And where he got into trouble is where he took the step over the line on the different conversation, and it looked to me like he had in his mind at least the notion there was a viable distinction that he might get away with. Well, first of all, again, that's not where he got into trouble. He got it just because that's where the prosecution finally said, threw up her hands and said, you know, we got to work this out. The prosecutor could have objected after the dog poop conversation. The prosecutor could have got into it all after the close of defense and prior to rebuttal. So I strongly disagree that he, quote, got into trouble after he asked about the July 18th telephone conversation. Why wouldn't it be from the defense counsel's point of view kind of a knight's rook from this position? And there's no way you can avoid it. And I mean that in this sense. Either he wins, and the judge says, question about one night, doesn't open the door to the other night. Witherspoon is not about two different days. It's about all taking place in one conversation. And then he wins. Or he loses, and the judge says, it opens the door and something bad comes in, and then he's got a point on appeal. Or he loses and loses on appeal, and he's got ineffective assistance, considering that he's got kind of a bad defense. I mean, among other things, it looks like he did kill the guy after all. He's shooting with what ammo he has here. And it creates kind of a dilemma for the prosecution by putting himself in a position to pull something out of the fire, no matter what happens. Well, first of all, looking at his other errors, which we discussed in the opening brief, which the panel opinion recognizes, I don't think he had that in him. To go back to your chess analogy, in terms of constitutionally reasonable tactical decisions, which is moving a little bit. I realize you don't think he had it in him, but the trial judge did. The trial judge probably knew him and thought he was a pretty clever fellow. Well, I don't know about that. I think the trial judge probably felt we're in the middle of trial. You screwed up. Let's move on. That's what I think. But to go back to your chess analogy, there is no case authority from the attorney general, from the U.S. intentionally or risking the admission of evidence that your client admitted or confessed to committing a murder is constitutionally reasonable trial tactics. The evidence that we have in our case ---- It depends on what you get for it. I mean, there's no absolute rule about these things. As Judge Ross pointed out, it depends on, you know, whether it's the only thing or, you know, it depends a lot on what role the confession plays. If there are a lot of other evidence, maybe another confession doesn't count much. Well, if you look at the authority that's cited in the briefs, they have none. We have the Berryman case from the sister circuit in effective assistance to just allow the jury to hear that your client is the subject of a homicide investigation. We have the Crotz case from this circuit in an assault case in effective assistance to hear that your client bragged about killing a police officer when that wasn't true. How do you explain the hung jury on the murder count in the first trial? Well, I explain it by nullification. Well, nullification what? Because of racism? Something else that happened during the deliberations? The California Court of Appeals cited it as one of the reasons for concluding that it may well have been tactical. In fact, it almost worked. Well, the California Court of Appeals cited it. We're concerned about this trial that he had as far as what is prejudicial and what is an unreasonable trial tactic. I think it's very strong evidence that, to my mind, that there was nullification that went on because of all that went on in the jury room, and I don't think that the Attorney General strongly disputed that in his briefs. The question is whether or not that decision and the reason for it was objectively unreasonable under AEDPA, isn't it? Counsel, let me ask this. The State court made the finding that this was a tactical decision. Did it ever go on to find that it was a reasonable tactical decision? Well, the Court of Appeals did in saying that it was reasonable to waive the privilege to allow the --" him to talk about the dogs. The trial courts didn't articulate it as such. They said, well, it's, you know, you have to put on your case the way you want to put on your case, and you've made that decision, and you put your client on the stand, and they didn't really say it was constitutionally informed or constitutionally reasonable, but the Court of Appeals did that. And the Court of Appeal also is finding that Mr. Myers intentionally waived the privilege is certainly not supported by the record, and that's a position that the Attorney General, at least in his reply brief, concedes, that there was no intentional waiver of the privilege, there was just gamesmanship, risk-taking, and a high-wire act. After having related his telephone conversation, he's then asked where his wife was, and then he's asked, did you tell her anything? If he had answered yes, would he have waived the privilege in your view? If he had answered, if he had answered yes, well, I'm not sure about that. I know in civil discovery, clients have always asked about the law. Well, then, how can you possibly say that it's absolutely clear that he was being the proper answer to the question? That is just like a privilege log, where you ask, did you have a conversation with your lawyer, answer yes, then one decides whether it was a privileged subject matter and whether any further inquiry can be made into it. That series of questions is exactly in that mode, it seems to me. Well, if it's in that mode, the purpose of a privilege log is to preserve privileges so that they can be litigated. It wasn't the client that busted it by blurting out a nonresponsive answer. Well, this is the lawyer's question that was the problem. And if he had gotten a yes answer, then it might have been a yes. I assume that the jury could then have inferred what he told his wife without his ever asking, what did you tell her? Well, the jury could have inferred that without him going there in the first place. No. Because based on what Mr. Edwards had testified as far as his actions that evening. And I submit, you know, when we're comparing privilege logs to trial testimony with lay witnesses like Mr. Edwards, you know, we talk about witnesses going south. If your client goes south, I've, you know, Mr. Edwards was also on the record that he never discussed how to answer the questions with Mr. Myers, never discussed how to answer the questions with Mr. Edwards. He was on the stand. He was asked questions. He answered them. I submit. It's a different issue, and that's not before us. Well, there's no doubt in my mind that if Mr. Edwards had just said yes, when we're talking about the phone call, trial counsel would have said, well, what did you tell her? How do we know that? Well, he didn't. How do we know that? I suppose as a matter of pure on-the-transcript record, we don't know that. But we do know that Mr. Edwards, that Mr. Myers asked the question about cleaning up after the dogs to Mr. Edwards. He asked the question about cleaning up after the dogs to Ms. Gaines. And we know the answers that did or would have come from that. We know how Ms. Gaines testified in rebuttal. That's the same way that she would have testified when he first asked the question during the cross-examination. And I also want to – I think this issue comes back to two – there are two aspects of the ruling, as we know. There's the informed tactical decision, and then there's the constitutional reasonableness. And we have no case authority anywhere that says that it's reasonable to allow your client to – evidence that your client admitted committing a murder, alleged or otherwise. And I want to focus on this Court's cases, decisions in Horton and Hayes. They're not ineffective assistance cases. They're Brady cases. But in a panel decision and an en banc decision, this Court held that that – the Some layperson came in, said the client had committed a murder, and that layperson had been substantially impeached. Your time has expired, counsel. That's red. Thank you. Thank you, Your Honor. Your Honor, just a few brief points. Could I ask a factual question? Yes, sir. On the question of the first jury, it's my understanding that the jury deadlocked because one of the jurors was angered by another juror's racial slur, and that that was the reason for the hung jury and all that. Is that inaccurate? Well, the trial court did conduct an inquiry into what was going on with the jury. And there was – there was testimony taken from some of the jurors regarding a possible racial incident. I don't recall off the top of my head what the trial judge's exact findings were. However, you know, we don't really know the full scope of what was going through that juror's mind. I would like to point out, however, in the report and recommendation of the magistrate, footnote 11, which is at page 34, this is in regards to the prejudice prong of Strickland. The magistrate does say, although the prosecution's circumstantial evidence was fairly strong, it was not overwhelming. And then dropping down to the footnote, as discussed, the jury in the first trial could not reach a decision on the murder count. And, you know, looking at that statement, although, you know, it may point to, I believe, erroneously characterizing the prosecution's case as less than overwhelming, it does point out the fact that what Attorney Myers did may have had a positive effect on that jury on behalf of his client. I would like to go back for a second to Judge Reimer's comments and questions. If there was no direct evidence explaining what — explaining that Petitioner's wife knew of the threat, the only way that evidence could come in is if Petitioner testifies that he told her of the threat, or if Gaines, his wife, testifies — I doubt she would have testified to this, but if she would have testified about the content of that conversation, either one would have waived the marital communications privilege. And so unless Attorney Myers dances up to that line and gets in as much evidence as possible, he's only going to be left with circumstantial evidence on his side facing an enormous amount of circumstantial evidence on the prosecution's side. And I'd also like to go back to Judge Kaczynski, and maybe this will answer your question, thinking about the record a little bit more. It appears that Attorney Myers maintained the position that he could ask questions about one conversation without waiving the privilege as to another. This goes back to the Worthington case, as well as argument by Second Trial Counsel and counsel in the court of appeal on behalf of Petitioner, who furthered this argument that Worthington did not foreclose a transactional approach to the privilege. Now, certainly, he lost on that issue, but it was not objectively unreasonable for him to do so, and it was not objectively unreasonable for the State courts to find that prong one was not satisfied by Petitioner. Unless the Court has any further questions, I would submit. There appear to be any. Thank you, counsel. Thank you very much, Your Honor. The case just argued is submitted for decision. That concludes the Court's calendar for this afternoon. The Court stands adjourned.
judges: Schroeder, B.fletcher, Pregerson, Kozinski, Rymer, Kleinfeld, Hawkins, Graber, Fisher, Paez, Tallman, Rawlinson, Clifton, Bybee, Bea